Charles WARKENTIEN and Patricia Ann Warkentien, Plaintiffs–Appellants,

v.

James J. VONDRACEK and Donna L. Vondracek, Defendants–Appellees.

No. 77–1766.

United States Court of Appeals, Sixth Circuit.

Cause Argued January 31, 1980.

Decided and Filed October 23, 1980.

Robert A. Benson, Cholette, Perkins & Buchanan, Grand Rapids, Mich., Peter J. Johnson, St. Joseph, Mich., for plaintiffs–appellants.

John W. Verdonk, Verdonk & Verdonk, Bangor, Mich., Calvin K. Hubbell, Valparaiso, Ind., for defendants–appellees.

Before CELEBREZZE and KEITH, Circuit Judges, and WISEMAN, District Judge.*

* Honorable Thomas A. Wiseman, Jr., District Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

**2**

WISEMAN, District Judge.

The issue to be decided on this appeal is whether the trial court properly granted a judgment n. o. v.[1] for the defendants after a jury verdict finding the defendant–vendors liable to the plaintiff–vendees for the innocent misrepresentations of the defendants' agent. The Court has thoroughly reviewed the record under the standards required in an appeal from a judgment notwithstanding the verdict, and we conclude that the lower court's decision should be affirmed.

As stated by District Judge Miles in an excellent opinion that accompanied his order of a judgment n. o. v.,[2] this litigation arose from the parties' perceptions of the use that could be made of a twenty–two acre parcel of land in Van Buren County, Michigan, known as the Rush Lake Campgrounds. The defendants, James and Donna Vondracek, conveyed this real estate to the plaintiffs, Charles and Patricia Warkentien, by means of a land contract executed on May 15, 1971. To understand the misfortunes that befell the plaintiffs after that conveyance, one must understand Act 171 of the Michigan Public Acts of 1970, Mich. Comp.Laws Ann. §§ 325.651–.665 (1975) (current version in Michigan Public Health Code, Mich.Comp.Laws Ann. §§ 333.-

12501, .12505–.12516) (1979) [hereinafter cited as the Act]. This Act established a statutory definition of "campground" as a parcel of land where sites are offered for the use of the public "for the establishment of temporary living quarters for 5 or more recreational units." The range of "recreational units" extends from the traditional tent to the modern recreational "motor home." The Act does not apply to mobile home parks of the type used for relatively permanent residences; those were covered by an earlier statute, and Rush Lake was licensed for twenty mobile homes under that law. Prior to January 1, 1971, the effective date of the Act, there had been no licensing requirements for campgrounds, and thus the Vondraceks had operated Rush Lake as a campground without significant legal impediment, in addition to maintaining a limited number of mobile home sites pursuant to their mobile home park license.

The defendants were aware of the Act's requirements, and they knew that Rush Lake would require extensive engineering work in order to comply with the new law and the regulations promulgated under it. During the negotiations that led to the sale, the plaintiffs also familiarized themselves with the Act, and Mr. Warkentien definite-

---

**1.** The lower court's judgment of July 11, 1977, purported to grant defendants' motion for a directed verdict, a decision which it had expressly reserved at the end of all of the evidence. Surprising though it may seem, the express reservation of a directed verdict motion does not authorize a district court to direct a verdict contrary to the jury's decision *in the absence of a motion for a judgment n. o. v., Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952); *see Philhall Corp. v. United States*, 546 F.2d 210, 213 (6th Cir. 1976); 5A J. Moore, Federal Practice ¶ 50.09 (1980). These authorities emphasize that the requirements of Rule 50(b), F.R. Civ.P., must be strictly followed in order for a party to obtain relief under its provisions. The defendants in this case failed to make an express motion for a judgment n. o. v., but simply renewed orally their previous motion for a directed verdict after the jury had been dismissed. Because a directed verdict is legally equivalent to a judgment n. o. v., *see Garrison v. Jervis B. Webb Co.*, 583 F.2d 258, 261 n.3 (6th Cir. 1978), it would elevate form over substance to find that the defendants' oral renewal

of their previous directed verdict motion failed to operate as a judgment n. o. v. motion. Thus, although it would have been the better practice to file a written motion for judgment n. o. v., we are satisfied that the defendants' oral renewal of their directed verdict motion was, in effect, a motion for judgment n. o. v. under Rule 50(b). For this reason, we will consistently refer to the lower court's judgment as a judgment n. o. v. *Cf. First Safe Deposit National Bank v. Western Union Telegraph Co.*, 337 F.2d 743 (1st Cir. 1964) (holding that a court may grant a reserved motion for a directed verdict if it acts within the time limit for submitting a judgment n. o. v. motion).

**2.** Although a district court is not required to file an opinion with a judgment n. o. v., the Sixth Circuit has heartily commended the practice. *See Garrison v. Jervis B. Webb Co.*, *supra*, 583 F.2d at 261 n.3. Judge Miles' effort is a superlative example of such an opinion, and we have borrowed heavily from it in portions of this opinion.

ly knew about the necessity of upgrading Rush Lake in order to operate it as a campground. The source of his complaint against the defendants is his belief that he would be allowed to operate Rush Lake until January 1974 without fully complying with the Act, in accordance with Regulation 325.1587 of the Michigan Public Health Department's campground regulations, which provided for the possibility of nonconforming uses until that date. Mr. Warkentien's expectations were disappointed when the local unit of the health department closed down Rush Lake's campground operations on July 10, 1971. Mr. Warkentien now claims that the defendants falsely assured him that Rush Lake could continue to operate under the nonconforming use regulation, and that he justifiably relied on this misrepresentation.

Upon a close examination of the record, however, the only reasonable conclusion that can be drawn is that if there were any misrepresentations in this case, they were made by Mr. Les Brown of the local health department unit, and if there was any justifiable reliance, it was based solely upon the misrepresentations of Les Brown. Because Mr. Brown was in no sense an agent of the defendants, they are not liable for the plaintiffs' injuries, if any,[3] resulting from Brown's misrepresentations.

### THE FACTS

After the Act had been passed in 1970, Mr. Vondracek and his father undertook a number of physical improvements in an effort to bring Rush Lake into compliance with the Act. However, upon the subsequent illness of the elder Vondracek, the defendants decided that it was inadvisable for them to continue the operation of the Rush Lake Campgrounds. They listed the property with LaVern R. Rice, Inc., Realtor. The plaintiffs noticed a newspaper ad

placed by the realtor, and the agency referred the plaintiffs to the appropriate salesperson, Mrs. Bernice Rudell, who showed them the property.

In the following month, Mr. Warkentien viewed the property five to ten times, at least once in the company of Mrs. Warkentien. The Vondraceks and the Warkentiens met several times to discuss the property. Before consummating the transaction, the plaintiffs were advised that the Act was in effect, that it required the licensing of campgrounds, and that Rush Lake Campgrounds was not so licensed.

Prior to committing himself, Mr. Warkentien, on his own initiative, contacted the Van Buren County Health Department to inquire about the steps he would have to follow in order to obtain a license to operate the property as a campground. He spoke with Les Brown, then director of the Van Buren County Health Department, and they discussed certain problems with the sewer system and the necessity of complying with the requirements of the Act. Accompanied by Mrs. Rudell, the real estate agent, Mr. Warkentien called upon James Brunet, chief sanitary engineer of Van Buren County, at which time Mr. Brunet gave him a copy of the Act. According to the plaintiffs' testimony, he and Brunet discussed the requirements of the Act that applied to Rush Lake.

As part of his pre–contract investigation, Mr. Warkentien also discussed the matter with his attorney, Warren B. Grosvenor, and, in the presence of Mrs. Rudell, they telephoned Les Brown to discuss the matter of bringing the property into compliance. Mr. Warkentien testified emphatically, at a number of points in the transcript, that in the course of this conversation Les Brown informed him that he could continue to operate the campground in the manner in which it had been operated in the past.[4] In

---

3. The district court concluded that there were no damages, but our disposition of the case does not require this Court to reach that question.

4. Les Brown denied that he made these statements, but because the Court is required to

view the evidence in the light most favorable to the plaintiffs without passing on the credibility of the witnesses, we will accept the plaintiff's version of events. *See Dowell v. General Telephone Co.*, 85 Mich.App. 84, 270 N.W.2d 711 (1978).

light of the information received in the course of his investigation, Mr. Warkentien entered into renewed negotiations with the Vondraceks. In recognition of the investment that would have to be made in the land because of the requirements of the Act, the Vondraceks agreed to reduce their asking price from $125,000 to $108,000. After consulting with Mr. Grosvenor, the plaintiffs signed a buy and sale agreement for $108,000 on May 8, 1971. Mr. Warkentien made it very clear in his testimony that his decision to sign the buy and sale agreement was based on the representations Les Brown had made to him during their phone call.

On May 15, 1971, the parties executed a land contract, bill of sale, and seller's closing statement. These documents are silent on the subject of the use to which the realty could or might be put, and they contain no assurances or covenants that the present use would be permitted to continue or that any statutory requirements had been satisfied or waived.

After the execution of the land contracts, the plaintiffs immediately assumed the management of Rush Lake and began successful operations, enjoying a particularly fruitful July 4 weekend. In a telephone conversation that occurred on July 8, 1971, however, Les Brown informed the plaintiffs that they were in violation of the Act and gave them forty–eight hours to have all recreational units removed from the park, with the exception of twenty units located on the twenty mobile home sites and four recreational units on the remaining property.[5] This directive was confirmed in a letter to the plaintiffs from James Brunet, the sanitary engineer. As a result of this forced reduction in the allowable use of the facilities, the plaintiffs were disappointed in their financial expectations. When other attempts to obtain satisfaction proved unsuccessful, plaintiffs initiated this diversity action on July 9, 1973.

The case was tried before a jury on November 10–12 and 15–16, 1976, on the issues of fraud or misrepresentation.[6] In response to the special interrogatories directed to it, the jury advised the court that it found actionable misrepresentation, but not fraud, by the defendants and their agent in the land contract transaction. The jury further advised that the land contract not be rescinded and that plaintiffs be awarded $162,000 in damages.

Prior to the submission of the case to the jury, the defendants had moved for a directed verdict both at the close of the plaintiffs' evidence and at the close of all of the evidence. The trial court took these motions under advisement and, after the jury's verdict, informed counsel that judgment would be entered only after a hearing on the motions. The motions were heard, memoranda were filed, and on July 11, 1977, Judge Miles entered judgment for the defendants.

## MISREPRESENTATION

The case was tried to the jury on the issues of fraud or misrepresentation by the defendants in the sale of Rush Lake Campgrounds. The judge submitted special interrogatories to the jury, and the jury found misrepresentation by the defendants' agent[7] in paragraphs 2 and 16 of the May 8 mutual agreement. The mutual agreement is a three–page document handwritten by LaVern R. Rice with approval signatures on the last page by Mr. and Mrs. Vondracek,

---

5. Twenty units were permissible because the mobile home license authorized that many mobile home sites, regardless of the type of unit. The plaintiffs were allowed four additional units because anybody could operate four campsites without having to comply with the Act.

6. Unknown to plaintiffs' counsel, Michigan law provides a cause of action for innocent misrepresentation. Although the plaintiffs failed to plead misrepresentation as a cause of action, the trial judge, citing Rule 15(b), F.R.Civ.P., nonetheless instructed the jury on the elements of actionable misrepresentation (as it is called in Michigan), because during the trial, plaintiffs' counsel had referred to misrepresentation without objection.

7. The jury did not identify the agent, but presumably it was either Bernice Rudell or LaVern Rice, the real estate agents.

Mr. and Mrs. Warkentien, LaVern R. Rice, and Bernice Rudell, the real estate agents. Paragraph 2 states:

> In reference to contact with Les Brown of Health Dept. & LaVern R. Rice, Realtor, buyer may provide temporary sanitary facilities for travel trailers and shall do so until new facilities are completed.

Paragraph 16 states:

> It is agreed that twenty sites are now wired for electric for campers and twenty—two sites more are available with use of extension cords.

According to the plaintiffs, the effect of these two provisions was to mislead them into believing that Rush Lake could be operated as a campground until January 1974 despite its acknowledged deficiencies under the Act, in accordance with the health department's noncomplying use regulations.

The jury was correctly instructed that under Michigan law, in order to recover for actionable misrepresentation, the plaintiffs have the burden of proving the following elements:

> (1) That the defendants or their agents made representations as to material facts which were false in fact; (2) that the representations actually deceived the plaintiffs; (3) that the plaintiffs relied on the representations; and (4) that as a result, the plaintiffs suffered damage.

*Essenburg v. Russell,* 346 Mich. 319, 78 N.W.2d 136 (1956).

### A. False Representation

■ Assuming that paragraph 2 can even be characterized as a representation by the defendants' agents to the plaintiffs, the record leaves no doubt that paragraph 2 is simply a memorandum of what all of the parties understood to be the position of the Van Buren County Health Department, as represented by Les Brown. Viewing paragraph 2 in the light most favorable to the plaintiffs, paragraph 2 was, at most, the defendants' "promise"[8] of what Les Brown

would allow in the future. The defendants could not be held liable *in tort* for their own broken promises of what they would do in the future, and thus there is no basis for finding them liable in tort because Les Brown failed to do what the defendants promised he would do. *See Hi–Way Motor Co. v. International Harvester Co.,* 59 Mich. App. 366, 229 N.W.2d 456 (1975), *aff'd,* 398 Mich. 330, 247 N.W.2d 813 (1976).

For the same reason, there was no misrepresentation by the defendants in paragraph 16, which refers to the number of sites with electrical hookup capacity. In the first place, there is absolutely no evidence to suggest that this paragraph misrepresented anything, because there was no testimony suggesting that there were not in fact twenty sites wired for electricity and twenty—two sites available with the use of extension cords. However, this paragraph was interpreted by the plaintiffs as another promise that Rush Lake could continue to be operated as it had been before the Act, because the representation that there were forty—two campsites implied that the plaintiffs could continue to operate the camp under the nonconforming use regulation. (I. e., unless they conformed with the Act, or were allowed to continue operations under the nonconforming use regulation, the plaintiffs could use only twenty—four sites: the twenty sites licensed under the mobile home laws, plus the four campsites that any citizen was entitled to, since the Act only comes into play when there are five or more campsites). For the same reasons discussed above, however, promises that Les Brown would allow continued operation in an unlawful manner could not give rise to tort liability on the part of the defendants, as a matter of law.

■ At this point we have determined that neither of the two items relied upon by the jury in the special interrogatories as the bases of misrepresentation could give rise to

---

8. The concept of making a promise for a third party poses certain conceptual difficulties, but it is the essence of the plaintiffs' claim. The plaintiffs were fully aware that the defendants had no authority, legal or otherwise, to authorize Rush Lake's operation under the noncomplying use regulation, and the alleged misrepresentation can only be described as a promise of what Les Brown, the director of the health department, would do.

tort liability. A reviewing court must look beyond the special interrogatories, however, to determine whether there was some other basis for a finding of tortious misrepresentation to justify the jury's ultimate verdict. We have scrupulously examined the record in this case, and there is simply no other evidence from which a reasonable person could infer that the defendants or their agents misrepresented anything. The trial judge allowed the plaintiffs every possible opportunity to prove some sort of misrepresentation or fraud, and they were unable to do so at any point in the five days of testimony. Consequently, we do not hesitate to conclude that the plaintiffs failed to produce a prima facie case that an actionable misrepresentation was made by the defendants.

### B. Reliance

Assuming arguendo that the plaintiffs had established misrepresentation, they would still be required to show that they relied on the misrepresentations of the defendants. They failed to carry this burden as well, because no reasonable person could conclude that the plaintiffs relied on anyone other than themselves and Les Brown. After Charles Warkentien became interested in the campgrounds, he personally conducted an investigation of the effect that the Act would have upon the continued operation. Before signing the mutual agreement of May 8, Mr. Warkentien, on his own initiative, contacted the Van Buren County Health Department to inquire about the licensing of Rush Lake Campgrounds, talked with Les Brown, revisited the health department, talked with James Brunet, received and studied the Act, and discussed the matter of licensing with his attorney.

No evidence was adduced to support a contention that the Warkentiens relied on any representations of the Vondraceks or their agents which they did not investigate for themselves. Plaintiffs made the decision to purchase Rush Lake Campgrounds on the basis of their own independent investigation and the alleged assurances of Mr.

Brown. Indeed, Mr. Warkentien's own testimony emphasizes again and again the central importance of Les Brown's alleged assurances. To the extent that the defendants might have reiterated Mr. Brown's representations, any conceivable reliance by the plaintiffs on those reiterations is insignificant in comparison with their reliance on Les Brown. The plaintiffs did not carry their burden of demonstrating the presence of reliance on representations of the defendants, which is necessary to recover on a theory of misrepresentation. *A & M Land Development Co. v. Miller*, 354 Mich. 681, 94 N.W.2d 197 (1959).

### THE JUDGMENT N.O.V.

In ruling on the defendants' motions for a directed verdict, the trial court properly recognized that granting them would be tantamount to entering a judgment notwithstanding the verdict under Rule 50(b), F.R.Civ.P.[9] Judgments n. o. v. are legally equivalent to directed verdicts, and the same standards govern the consideration of either. *See Garrison v. Jervis B. Webb Co.*, 583 F.2d 258, 261 n.3 (6th Cir. 1978).

■ Although it was an error without consequence, the trial court incorrectly applied the federal standard for determining the propriety of a directed verdict. In this circuit, motions for a directed verdict must be considered under the applicable state standards for directed verdicts. *Garrison v. Jervis B. Webb Co., supra*, 583 F.2d at 261 n.4. However, the Michigan standard for directed verdicts appears to be identical to the federal standard, which is referred to as the "reasonable minds" test. Under this standard, a trial court should grant a motion for a directed verdict when, after viewing the evidence in the light most favorable to the non–moving party, the evidence points so strongly in favor of the movant that reasonable minds could not come to a different conclusion as to the appropriate verdict. The issue raised by a motion for a judgment n. o. v. is whether there is sufficient evidence to raise a question of fact for the jury. A reviewing court must apply the

---

9. *See* note 1 *supra*.

same standards. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

■ A recent statement of the Michigan standard for judgments n. o. v. is found in *Cormack v. American Underwriters Corp.*, 94 Mich.App. 379, 288 N.W.2d 634 (1979). The Michigan court wrote that:

A judgment n. o. v. on defendant's motion is appropriate only if the evidence is insufficient as a matter of law to support a judgment for the plaintiff. In reviewing a motion for judgment n. o. v., the Court must give the nonmoving party the benefit of every reasonable inference that could be drawn from the evidence. *If reasonable minds could honestly disagree as to whether the plaintiff has satisfied his burden of proof or the necessary elements of his cause of action, judgment n. o. v. for the defendant is improper.*

*Id.* at 636 (emphasis added). This language is virtually identical to the Sixth Circuit's language in *Morelock*, and thus we conclude that the Michigan standard for judgments n. o. v. is legally equivalent to the federal standard. *See also Caldwell v. Fox*, 394 Mich. 401, 231 N.W.2d 46 (1975); *Dowell v. General Telephone Co.*, 85 Mich.App. 84, 270 N.W.2d 711 (1978); *Cody v. Marcel Electric Co.*, 71 Mich.App. 714, 248 N.W.2d 663 (1976). This means that although the trial court erred in not looking to Michigan law, it nonetheless effectively applied the appropriate Michigan standard for directed verdicts.

■ Looking at the evidence in the light most favorable to the plaintiffs, and without passing on the credibility of the witnesses, we can only conclude that, at most, the plaintiffs established a misrepresentation by Les Brown and their reliance on it.

So far as the record discloses, Les Brown was the only person who might have led the plaintiffs to believe that they could operate under the nonconforming use provisions until 1974. Indeed, the lack of any proof in regard to the defendants and their agents is so striking that the plaintiffs' case would fail to pass muster under the abandoned "scintilla" standard. Although speculation about the reasons for the jury's verdict would ordinarily be inappropriate, we cannot resist the observation that the jury might have concluded that Les Brown was somehow the defendants' agent, despite the total absence of any suggestion to that effect. Absent that explanation, the jury's verdict is completely inexplicable, unless perhaps it was the result of passion or prejudice, as Judge Miles suggested.[10]

Accordingly, the decision of the lower court is affirmed.

---

**10.** Judge Miles cited inconsistencies in the jury's response to the special interrogatories in further support of his conclusion that the jury exhibited "total miscomprehension of the issues in this case." Although the jury stated that both the defendants and their agents committed actionable misrepresentation, it failed to specify the particular misrepresentation of the defendants, as required by one of the interroga-

tories. Furthermore, the jury's $162,000 damage award apparently presumed rescission of the land contract, despite the jury's recommendation that rescission not be ordered. Although these internal inconsistencies are not necessarily inconsistent with the general verdict, they do support in some measure the trial judge's conclusion that the jury's verdict was unreasonable.